**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ROBERT MEYERS,** | ) |
| | ) |
| **Plaintiff,** | )   **2:12-cv-1258** |
| | ) |
| **v.** | ) |
| | ) |
| **THE CALIFORNIA UNIVERSITY OF** | ) |
| **PENNSYLVANIA, GREG HARRISON,** | ) |
| **RICHARD MIECZNIKOWSKI, JIM BOVÉ and** | ) |
| **SCOTT LLOYD,** | ) |
| | ) |
| **Defendants.** | ) |

<u>**MEMORANDUM OPINION AND ORDER OF COURT**</u>

Pending before the Court is a MOTION FOR SUMMARY JUDGMENT (ECF No. 52) filed by Defendants The California University of Pennsylvania ("CalU"), Greg Harrison, Richard Miecznikowski, Jim Bové, and Scott Lloyd (collectively, the "Employee Defendants") with brief in support (ECF No. 53). Plaintiff Robert Meyers filed a brief in opposition (ECF No. 69). The summary judgment record has been fully developed via the submission of Defendants' concise statement of material facts ("CSMF") (ECF No. 54) and appendix (ECF No. 55); Plaintiff's Responsive CSMF ("ECF No. 68), Statement of Additional Facts (ECF No. 70) and appendix (ECF No. 71); and Defendants' Response to Plaintiff's Statement of Additional Facts (ECF No. 74) with a supplement (ECF No. 75) attached. Also pending is Plaintiff's MOTION FOR JUDICIAL NOTICE (ECF No. 72) with brief in support (ECF No. 73). Defendants filed a brief in response (ECF No. 76). Accordingly, the motions are ripe for disposition.

## I.    Background

The following background is taken from the Court's independent review of the motion for summary judgment, the filings in support and opposition thereto, and the record as a whole.

### A. Factual Background

#### 1. The Parties

CalU is one of fourteen constituent universities of the Pennsylvania State System of Higher Education ("PASSHE") operated by the Commonwealth of Pennsylvania. *See* 24 Pa. Stat. Ann. § 20-2002-A, *et seq.* CalU maintains a Department of Art and Design within its College of Liberal Arts which is located primarily in Vulcan Hall and Coover Hall on the college campus. During the relevant time period, the Department of Art and Design included the following ten faculty members: Professor Greg Harrison, Department Chair; Professor Laura DeFazio; Professor Richard "Duke" Miecznikowski; Associate Professor Maggy D. Aston; Associate Professor R. Scott Lloyd; Associate Professor Todd Pinkham; Assistant Professor James B. Bové; Assistant Professor Robert Meyers; Instructor Susan Mohney; and Instructor Cara Snyder. Several of these faculty members allegedly constituted distinct cliques within the Department. *See, e.g.*, Dep. Tr. of Barnhart, Defs.' Ex. D-86 at 29, ECF No. 55-14 ("My perception would be that Harrison, Miecznikowsk, Bové, Lloyd, [and] Maggy Aston, would have seen [DeFazio] as being in the same camp with Robert [Meyers] and with Todd Pinkham").

Plaintiff, Meyers is a professional graphic designer. He graduated from Bowling Green State University in 1981 with a Bachelor of Fine Arts and from Kent State University in 1997 with a Masters of Fine Arts. Since the completion of his undergraduate education, Meyers worked in the advertising and graphic design fields and operated his own firm for roughly the last twenty-five years. After he obtained his graduate degree in the field of graphic design / visual communication arts, Meyers taught courses at the University of Akron, Rochester Institute of Technology, and Robert Morris University. While teaching part-time at Robert Morris University in 2008, Meyers sought and obtained a tenure-track faculty position at CalU in the

Department of Art and Design where he began teaching as an Assistant Professor the following Fall term. Over the course of his career, Meyers has obtained many professional and academic accolades which include recognition by juried design contests and various publications.

## 2. Faculty Review

All faculty members at PASSHE schools are union members and represented by the Association of Pennsylvania State College and University Faculties ("APSCUF"). PASSHE and APSCUF have entered into a series of Collective Bargaining Agreements ("CBA(s)") to govern the terms of faculty employment at all fourteen institutions. The relevant CBA is dated October 11, 2007. *See* Defs.' Ex. D-2, ECF No. 55-1.

Under the CBA, all full-time, tenure track faculty members are subject to a five-year probationary period during which they receive a one yearlong appointment contingent on annual renewal/non-renewal reviews. The reviews are conducted on several levels by a department evaluation committee, the department chair and the school dean, all of whom assess a probationary faculty member's performance in three broad categories: effective teaching and fulfillment of professional responsibilities; continuing scholarly growth; and service contribution to the University and/or community. Department faculty members also peer review classroom teaching as part of this review process. The CBA affords probationary faculty members limited grievance rights for the first five years.

In the Department of Art and Design, the evaluation committee is comprised of three to four faculty members who are selected at random and approved by a vote during an annual summer retreat. According to Meyers, Harrison would instead hand-select members of committees charged with evaluating individual faculty members and call for a blanket vote to ratify his decision irrespective of the CBA forbidding such a process.

### a. Evaluation for Renewal 2008-2009

Meyers' first year evaluation committee, comprised of Snyder, Lloyd and Mohney, issued its report in January 2009. The report made no specific recommendation as to renewal but concluded as follows:

> Professor Meyers is meeting [the committee's] expectations with regard to all aspects of performance review mandated by the [CBA]. An area identified by the committee as one that merits attention is the new Typography course. The committee recommends that Professor Meyers merge additional technology into his pedagogy in order to complement traditional techniques. In summary, we are pleased to recognize the contributions of a valued new colleague.

Defs.' Ex. D-8 at 4, ECF No. 55-3. The report also includes several positive observations regarding Meyers' teaching effectiveness, creative research and professional activity, and service to the Department, university, and community. *See, e.g. id.* at 2, ECF No. 55-3 at 28 ("Faculty observations of Mr. Meyers' classroom performance are very positive. They note the rapport he has established with his students in his brief time here, his professionalism, and his ability to teach students to emphasize both concept and craft in their work.").

Harrison issued the Chair's Evaluation Report on February 10, 20009 in which he concurred with the evaluation committee. Moreover, Harrison agreed that Meyers had "[met] his expectations with regard to all aspects of performance review." Defs.' Ex. D-12 at 1-2, ECF No. 55-3 at 40-41. Harrison did, however, observe that "[s]tudent evaluations of Mr. Meyers teaching are mixed but many are quite positive."[1] *Id.*

Dr. Michael L. Hummel, then-Acting Dean of the College of Liberal Arts, apparently viewed the evaluations far more negatively and contacted Harrison to voice his difference of

---

[1]. At his deposition, Harrison explained that he struggled in reaching this assessment. *See* Defs.' Ex. 55-11 at 201, ECF No. 55-11. More specifically, Harrison stated: "[s]o it was a hard thing for me to deal with. There were negative responses, but, again, I wanted to be as supportive as I could. So that was the best phrasing I could come up with at the time where student evaluations of Mr. Meyers['] teaching are mixed, which they were, but again, many are quite positive and there were positive evaluations in there from students." *Id.* Meyers claims that Harrison did not conduct this evaluation in good faith. *See* Pl.'s Responsive CSMF at 5-6, ECF No. 68 at 6-7 (citing Response Addendum, Pl.'s Ex. 110, ECF No. 71-4).

opinion. As Harrison recounts, Hummel asked him "are you crazy? Why are you writing this? And [Hummel] said [that he had] never seen any worse evaluations in [his career]. He says, I can't believe you want to renew this guy's contract, and he was angry." Defs.' Ex. D-83 at 201-202, ECF No. 55-11. Nevertheless, on February 12, 2009, Hummel submitted his evaluation which recommended that CalU renew Meyers' contract for the 2009-2010 academic year.

In his evaluation, Hummel reported that he found Meyers' "first year endeavors in the area of teaching, research and service to be satisfactory." Defs.' Ex. D-13 at 1, ECF No. 55-3. Hummel also made the following observation with regard to Meyers' teaching:

> Teaching is primary to what we do here. The reviews of your chair and your peers suggest that you are meeting the standards in this area. Your committee reports that you are meeting the expectations in the areas of teaching. They also recognize that you need to make adjustments with the Typography course to better serve the students. Your chair concurs with the assessment of the committee that you are meeting the standards. The chair comments on the varied student evaluations, as being both positive and negative, and mentions the positive verbal comments provided by your students. Your students consistently provide favorable reviews of your teaching. The majority of your students are exceedingly satisfied with your work as their professor. The most constant concern expressed in student evaluations reflects the need for clearer instruction, better use of time and more interaction with students. However, I am certain that you will make adequate adjustments.

*Id.* Hummel did comment positively on Meyers' significant accomplishments in the area of service and his pursuits in the area of scholarship.

On April 1, 2009, then-CalU President Angelo Armenti, Jr. offered Meyers a contract for the 2009-2010 academic year. Much like Hummel, Armenti commented that he "would also encourage [Meyers] to follow this advice [*i.e.*, to make some adjustments in your teaching in order to better serve its students] and to work closely with [the] Dean and Professor Harrison in this regard." Defs.' Ex D-14 at 1, ECF No. 55-3. Meyers later accepted the contract.

### b. Evaluation for Renewal 2009-2010

Meyers' second year evaluation committee, composed of Bové, Pinkham and Snyder, issued its report on November 1, 2009. As to Meyers' teaching effectiveness, the committee assessed that "[he] is doing a good job of educating our student[s] and fulfilling the university mission of building careers. His focus on teaching students the skills necessary to navigate good design is appreciated as our graphic design program builds." Defs.' Ex. D-16 at 1, ECF No. 55-4. The committee reached similar conclusions in the areas of scholarly and creative growth and service, concluding as follows: "Meyers is an important member of our Department of Art & Design. His dedication to teaching, scholarly activity and service meets the [D]epartment's expectations. He has proven to be an asset to the expanding graphic design program." *Id.* at 2.

Harrison issued the Chair's Evaluation Report on November 1, 2009 in which he concurred with the evaluation committee's report in the area of teaching and commended Meyers in the areas of scholarly grown/creative activity and service. Harrison also commended Meyers on his "enthusiasm and dedication to teaching, scholarly activity, and departmental service." Defs.' Ex. D-22 at 1-2, ECF No. 55-4. Similarly, Harrison concluded that "Meyers has quickly become a very important member of the Department of Art and Design." *Id.*

Dean Hummel struck a somewhat different cord in his December 1, 2009 letter to Meyers. Relying on his assessment of the student evaluations, Hummel observed that

> [a]n estimated 50% of the students in [Meyers'] ART 428-01 course would not recommend you to other students. A large percentage of the responses in all evaluated categories were neutral to negative in nature. I was very concerned about the lack of positive assessments for this particular course. While your ART 127-01 course was somewhat more positive in nature, the ART 262 course had a significant number of neutral to negative responses to your work in the classroom. Overall, you received too many neutral and negative responses in your courses for me to consider your classroom work to be satisfactory. I mentioned this problem in your last evaluation. You clearly stated for your teaching goals in your self-assessment that you will address this problem; however, the problem still seems

evident. I highly recommend that you review your course student evaluations, seek guidance from your chair and improve on this area of responsibility for next year.

Defs.' Ex D-23 at 1, ECF No. 55-4. Further, Hummel applauded Meyers in the areas of service and scholarship and recommended that CalU renew his contract for the 2010-2011 academic year. *See id.* ("Reflecting on all that you have achieved thus far this year, it is my pleasure to recommend to the Provost and to the President that your contract be renewed . . . .").

On December 14, 2009, Meyers sent Hummel a letter in which he addressed the critique of his teaching. To summarize, Meyers highlighted that his colleagues found his teaching methods satisfactory, that a neutral assessment is not a negative assessment, that his students had to adjust to a different teaching style, and that his students came to appreciate the aspects of design which he stressed based on his professional experience as a graphic designer.[2] The record is unclear as to whether Meyers ever received a reply from Hummel.

On January 9, 2010, Armenti offered Meyers a contract for the 2010-2011 academic year. In his letter, Armenti once again encouraged Meyers to work with Hummel and Harrison in order to improve his teaching so that he may better serve students in the classroom. Meyers later accepted the renewal offer.

### c. Evaluation for Renewal 2010-2011

Meyers' third year evaluation committee, composed of Miecznikowski, Bové, Mohney and Lloyd, issued its report on October 26, 2010. Regarding his teaching, the committee reached

---

2. The peer observations of Meyers' classroom teaching do, in fact, reflect positive reviews by his colleagues. For example, Aston commented that "[she] feel[s] confident that our students are receiving excellent training in the hands of this experienced designer." Defs.' Ex. D-17 at 1, ECF No. 55-4. DeFazio likewise concluded that "Professor Meyers is clearly doing an excellent job in the classroom; the Department of Art and Design is lucky to have him on board" and that she "ha[d] no recommendations for Professor Meyers but to keep up the excellent work!" Defs.' Ex. D-18 at 1-2, ECF No. 55-4. Additionally, Bové scaled Meyers as "exemplary" in six categories and "satisfactory" in another two categories. Defs.' Ex. D-20 at 2, ECF No. 55-4. And Harrison's evaluation and recommendation included the following remarks: "I continue to be impressed with Mr. Meyers['] passion for graphic design and I believe that he is doing an excellent job in this course . . . I have no recommendations except that Mr. Meyers continue with his effective studio methods." Defs.' Ex. D-21 at 2, ECF No. 55-4.

the following conclusion: "It is evident from peer evaluations that [ ] Meyers is capable of teaching satisfactory class and has made improvement to his teaching. Student evaluations are not as positive as [ ] Meyers stated in his self-assessment. The committee finds his teaching satisfactory with room for improvement."[3] Defs.' Ex. D-27 at 1, ECF No. 55-5. The committee also "disagree[d] with [ ] Meyers that he has exceeded expectations in [the area of professional/creative research], but [found] that there has been an adequate level of creative research for a second year teacher and encourages an expansion in this area." *Id.* The committee further found "contributions in the area of service to the [D]epartment and the university to be lacking." *Id.* at 2. In assessing his departmental service, the committee noted that "[t]his is one area that [they] have noticed a distinct lack of enthusiasm and even conflict." *Id..* Notably, the committee stated that "[t]he failed Graphic Design search, which [Meyers] chaired from last semester, should have been mentioned with a fair self-assessment of his performance." *Id.* The committee concluded: "[i]n light of the overall lack of contributions to the [D]epartment and the university, and the limited progress in the areas of teaching and professional development, the committee does not recommend for contract renewal." *Id.*

Harrison issued the Chair's Evaluation Report on November 8, 2010 in which he concurred with the committee and recommended that Meyers' contract not be renewed. In his report, Harrison observed that Meyers' student evaluations were improving but raised concerns that they "have not come up further." Defs.' Ex. D-34 at 1, ECF No. 55-5. Harrison also recognized the support that Meyers has received from his colleagues, but noted the apparent disconnect between his positive peer observations and the student evaluations which raised

---

3. The committee recognized the overall improvement in Meyers' teaching and student evaluations, which would otherwise demonstrate an observable development in a second-year teacher's student evaluation; however, the committee also observed that the evaluations were not commensurate with Meyers' seven years of teaching experience.

concerns. Additionally, Harrison claimed that Meyers had not heeded the advice of Hummel for the parties to meet and discuss his teaching—an assertion that Meyers contends is demonstrably false.[4] Meyers likewise received poor reviews in the areas of scholarly growth/creative activity and service. *See, e.g.*, Defs.' Ex D-34 at 2, ECF No. 55-5 (commenting on Meyers' "argumentative style on the Lecture Series Committee; his lack of communication with the [D]epartment chair in implementing the Technology Fee; his lack of involvement on our Outcomes Assessment Committee; [and] his inability to ensure that a fair, equal and impartial process was used for the interviewing of applicants on the Graphic Design Faculty Search").

Hummel released his review on November 22, 2010, concluding that he could not recommend to the Provost and President that they renew Meyers' contract for continued employment at CalU. In his letter, Hummel once again emphasized that, although there were some positive student evaluations, Meyers received too many neutral and negative responses to garner a positive review. Moreover, based on Meyers' previous university experience, his earlier teaching assessments, the committee's report, and the chair's review, Hummel opined that Meyers was not meeting the teaching standards expected at CalU. Hummel also commented negatively on Meyers in the area of service, noting that "it is very difficult for [him] to provide any type of support in this area when the leadership and the faculty members in [Meyers'] [D]epartment have lost faith in [his] ability to be an effective team player in that [D]epartment." Defs.' Ex. D-35 at 1, ECF No. 55-5. Finally, in the area of scholarship, Hummel concurred with the evaluation committee and Harrison in their assessments.

---

4. Attached to Meyers' Declaration are e-mails in which he seeks the advice of Harrison regarding a potential assignment for his students and discusses possible guest speakers for their classes. *See* Pl.'s Decl. at 23-29, ECF No. 71-6. Meyers also claims that he met with Harrison on several occasions to seek advice but that Harrison did not give him any suggestions for improvement. *See id.* at 18.

### d. Termination

On December 1, 2010, Meyers sent Armenti a letter in which he shared his views on what attributes he brought to CalU as a graphic designer, teacher, and active community member. Meyers also noted that "there have been challenges in my [D]epartment prior to [his] arrival, and it was quite surprising to find [him]self having to deal with these dynamics."  Defs.' Ex D-36 at 1, ECF No. 55-5.  Further, Meyers expressed his desire to be "part of some of the solution to these problems as well" should he remain at CalU.  *Id.*  Meyers does not, however, explain these "challenges" and "dynamics" in any greater detail.[5]

On January 21, 2011, Armenti informed Meyers that his contract would not be renewed for the 2011-2012 academic year.  Armenti stated that he took into account the recommendations of the evaluation committee, Harrison, and Hummel.

Since his termination, Meyers has continued to work at his company but has been unable to obtain a full-time faculty position at another college or university.  Meyers has secured several part-time teaching positions and currently teaches at Point Park University.  In sum, Meyers claims that his poor evaluation, non-renewal, and termination were in retaliation for voicing opposition to gender discrimination within the Department of Art and Design during a faculty search that he chaired.

### 3. Faculty Position Searches

The process for hiring new faculty is set forth in the CBA and the written guidelines used at CalU.  To begin a faculty search, departments must first identify their needs to the administration for its review.  If a position is approved, the department appoints a search committee and a chair to guide the process.  The next steps entail posting for, receiving and

---

5.  Meyers asserts that he met with Armenti after he learned of the decision to not renew his contract.  At this meeting in Armenti's office, Meyers allegedly opined that the search process was unfair and discriminatory. Armenti then purportedly stopped the meeting and rushed Meyers out of his office.

reviewing applications; conducting telephone interviews; and inviting several candidates onto campus for teaching and/or research demonstrations. The search committee will then submit one or more candidates to the entire department for approval, which requires a majority of the regular full-time faculty. If a candidate receives a sufficient number of votes, the department forwards his or her name to the administration for further consideration. According to Meyers, the Department of Art and Design has a history of ignoring the CBA.

In 2008, the Department of Art and Design began its efforts to obtain accreditation by the National Association of Schools of Art and Design ("NASAD"). As part of this process, CalU authorized two new faculty positions within the Department: one in art history and another in graphic design. Meyers was appointed chair of the graphic design search committee sometime in late-2009 or early-2010; Miecznikowsi was appointed chair of the art history committee.

After his appointment, Meyers solicited the advice of Dr. Stanley Komacek (the then-Assistant Provost at CalU and Faculty Search Coordinator) and DeFazio (his colleague in the Department of Art and Design and its former chair) with regard to the search process.[6] Both Komacek and DeFazio recall that Meyers asked about the procedures for the Department to vote on the candidates. DeFazio also recalls that Meyers asked her what role, if any, the Department chair has in the selection of a candidate. Additionally, Komacek notes that Meyers and Harrison repeatedly contacted him to accuse each other of manipulating the search process and intimidating faculty in order to garner support for their preferred candidate.

---

6. DeFazio attests that she "ha[s] been vocal in [her] opposition to gender discrimination within the Art Department in particular and throughout CalU at large" and that she stepped down as chair in 2006 "[d]ue to the hostile and discriminatory animus shown to me by [the Employee Defendants] coupled by condonation on the part of the former interim Dean of the College of Liberal Arts, Sean Madden." Decl. of DeFazio at 1, 3, ECF No. 71-5. Defendants deny that those facts are material and aver that many of her complaints have been unfounded. *See* Defs.' Responsive CSMF at 3, ECF No. 74.

Both search committees ultimately approved candidates to submit to the full Department for a vote. The graphic design search committee chaired by Meyers recommended two candidates: Bridget Marshala and Richard Helfrich.[7] Marshala was the favored choice of the search committee.

On May 13, 2010, Meyers called for an online meeting via e-mail for the purpose of having a discussion period for and a vote on the candidates. The discussions were permitted to take place online, through telephone conversations and face-to-face meetings. The result of the e-mail vote was that the participating faculty voted unanimously (7-0) to recommend Marshala to the administration; Helfrich received only two favorable votes. Meyers forwarded Marshala's name to the administration as the approved candidate of the Department of Art and Design, apparently in accordance with the CBA, CalU's hiring procedures, and the directives he received from Komacek. Further, Komacek had allegedly indicated to Meyers that the endorsement of only one candidate would not by itself invalidate the search. The administration did, however, purportedly prefer that departments endorse and forward more than one candidate for an open position so that the president could make the ultimate decision.[8]

Nevertheless, while the e-mail voting period was still open, Harrison sent a Department-wide e-mail in which he "thank[ed] everyone on both committees for doing an excellent job on the Art History and Graphic Design searches" and asked the faculty to contact him with "any questions or concerns regard the slate of candidates for either [ ] position." Defs.' Ex D-40 at 15, ECF No. 55-6. In response, Lloyd expressed his concerns over not having met with either

---

7. Meyers repeatedly alleges that Helfrich and Harrison were acquaintances, citing a holiday party that Helfrich attended at Harrison's home in 2009 along with sixty to seventy other people. There are also allegations that Helfrich improperly used copyrighted images created by others (*i.e.*, an advertisement from Harry Winston Jewelers) in his initial job interview presentation.

8. The Guide to Faculty Searches used at CalU similarly recommends that at least three names are forwarded for department approval. *See* Defs.' Ex. D-3 at 17, ECF No. 55-2.

graphic design candidate because of the parallel schedules of the searches and called for an in-person departmental meeting so that the faculty could discuss the selections for both searches. Miecznikowski, Bové, and Aston also agreed with Lloyd; Harrison indicated that he would follow the lead of his colleagues. A meeting was scheduled for May 18, 2010 (the "Meeting")—*i.e.*, five to six months before his negative third-year renewal evaluations. According to Meyers, "Harrison and his allies" called for the meeting for the purpose of reversing the departmental vote and "re-voting" for their preferred male candidate Helfrich.

### 4. The May 18, 2010 Meeting & The Cancelled Search

The day before the Meeting, Meyers sent Komacek an e-mail in which he sought advice on what to do in light of the scheduled re-vote meeting and Marshala's name having already been submitted to the administration. *See* Pl.'s Ex. 39 at 1-2, ECF No. 71-2. Komacek responded: "[t]hat is interesting. If there was already a meeting & vote what is the reason for redoing the vote? If the meeting is held I assume / hope faculty will stick by their original vote. Is it time for people to stand up / speak up?" *Id.* After that correspondence, Meyers again sought "any suggestions and/or words of advice" from Komacek. *Id.* at 1. Komacek responded in a similar fashion: "[N]o, I don't really have any good advice. I have never heard of or experienced anything like this, and I don't know what is acceptable given the CBA and any EEOC-type rules/regulations. My only advice would be to consult with people who might have experience or expertise in these areas." *Id.*

The Meeting was held in the conference room in Vulcan Hall as scheduled. Harrison, Aston, Lloyd, Meyers, Miecznikowski, Mohney and Pinkham were all in attendance; Bové (in Japan), Snyder (at a conference), and DeFazio (had a scheduling conflict) did not attend the

Meeting. There are several conflicting renditions in the summary judgment record as to what occurred that evening.

Minutes from the Meeting, which were recorded by Department secretary Jennifer Adamson, reflect that the faculty members expressed concerns regarding the difficulties with two simultaneous searches, that they discussed and voted on the art historian slate recommendations, and that they discussed and voted on the graphic design slate recommendations. Moreover, the faculty discussed why Helfrich was not on the graphic design slate and the impact of going against the graphic design search committee's recommendation. Five members of the faculty voted to include both Marshala and Helfrich on the graphic design search committee slate; two members opposed the motion; and one abstained.[9] The minutes were amended on May 24, 2010 to reflect that Meyers objected to the meeting as invalid because the vote was already completed via e-mail per Komacek's instructions; that he was in an uncomfortable situation as a non-tenured faculty member chairing a search committee; that several faculty members requested a face-to-face meeting; and that there was disagreement as to whether the search committee slate should differ from the faculty vote.

Meyers contends that the minutes are inaccurate and incomplete. As Meyers asserts, the minutes fail to mention that "Harrison and his allies bullied and pressured" some faculty members to change their vote on the vacancies after Helfrich initially failed to achieve a sufficient number of votes of confidence; that Miecznikowski shouted an explicative; that Harrison threw a wad of paper at Pinkham; and that he raised concerns regarding gender discrimination. According to Meyers, he "noted that, in light of the superior qualifications of Ms. Marshala, an unsanctioned 're-vote' would constitute a sexist and discriminatory action."

_____

9. In his declaration, Pinkham asserts that multiple votes occurred at the Meeting and that Helfrich did not achieve a sufficient number of votes of confidence after the first vote. Pl.'s Ex. F at 3, ECF No. 71-9.

Pl.'s Ex. C at 7, ECF No. 71-6. Pinkham recounts a similar narrative in his Declaration. *See* Pl.'s Ex. F at 3, ECF No. 71-9 (¶ 22. Prof. Meyers further stated that holding a second departmental vote on both Ms. Marshala and Mr. Helfrich was sexist and discriminatory in light of the fact that the credentials of the favored candidate, Ms. Marshala, were superior to those of the runner-up male candidate, Mr. Helfrich."); *id* at 4 ("¶ 26. At this meeting, Prof. Miecznikowski screamed profanity at me; Prof. Harrison also threw a wad of paper at me in obvious anger. ¶ 27. Prof. Miecznikowski ultimately stormed out of the room prior to casting his vote.").

Many of the attendees now assert that they do not recall Meyers making any statements regarding gender discrimination. Rather, they recollect that Meyers raised an issue with regard to Helfrich's use of copyrighted material during his class presentation. For his part, Meyers contends that he also made express and detailed comments regarding the discriminatory nature of the process to CalU administrators, including Komacek, Lisa McBride and Gena Sproul of the CalU Office of Social Equity, and Armenti. Based on his account, McBride and Sproul agreed with Meyers that the "re-vote" constituted gender discrimination. Pinkham and DeFazio also allegedly reported to McBride that Meyers was targeted for retaliation because of his opposition to the so-called discriminatory practices. McBride, in turn, apparently warned Meyers that he may be the target of retaliation.

After the meeting, Meyers was directed to change the slate to include both Marshala and Helfrich but he apparently refused. Meyers instead insisted that the vote at the Meeting contravened establishment procedures, and therefore, it was invalid. According to Meyers, McBride instructed him not to recognize the "re-vote" or else the administration would deem the search a "failed search" because a valid vote had already been taken, submitted and accepted.

CalU ultimately cancelled the graphic design search, and the position was not filled for the 2010-2011 academic year. Although it is somewhat unclear, the record reflects that this decision was likely made by CalU Provost Geraldine Jones based on the purported irregularities with the search. The search was re-conducted by the Office of Social Equity the following year.

### 5. The Grievances

Meyers also highlights several written grievances that he filed as additional evidence of protected activity. Meyers filed his first grievance on November 30, 2010 through the APSCUF representative and Assistant Professor in CalU's Department of Modern Languages and Culture Arcides Gonzalez. In his grievance statement, Meyers describes the alleged violations of the CBA and University guidelines in the search and the so-called retaliatory evaluations by the committee, Harrison, and the Dean which followed. Associate Provost/Associate Vice President for Academic Affairs Bruce Barnhart responded in a December 16, 2010 letter in which he construed the grievance as having challenged the non-renewal recommendations and advised Meyers of his limited rights under the CBA. Meyers filed his second grievance through Gonzalez on March 23, 2011 in which he again raises concerns regarding his non-renewal; Barnhart responded in a similar fashion. Meyers has also identified a third written grievance in which he was involved, submitted by Gonzalez on December 7, 2010 on behalf of Michael J. Slavin, a professor in CalU's Department of Theatre and Dance. This grievance summarizes faculty meetings with Dean Hummel in which they discussed, *inter alia*, "abusive language, bullying, retaliation, not following university and CBA procedures, process and guidelines . . . plus issues of sex discrimination and third-party harassment, within that past week, and extending back many years." Defs.' Ex. D-43 at 2, ECF No. 55-7. On January 3, 2011, Barnhart advised Slavin that CalU's Office of Social Equity was formally investigating the matter.

The Employee Defendants claim that they were not aware that Meyers had made a complaint to the Office of Social Equity or that he filed any grievance while at CalU. The members of Meyers' final evaluation committee (Miecznikowski, Bové, Lloyd and Mohney) also claim that their work was fair and that Harrison never directed them to reach a predetermined outcome. For his part, Harrison asserts that he had no objection to having a female candidate or to having a female faculty member teach graphic design; that he found Marshala highly qualified; and that he never attempted to send only Helfrich's name to the administration. Additionally, all of the Employee Defendants deny that any form of gender discrimination occurred.[10]

## B. Procedural History

On April 20, 2011, Meyers filed a charge of gender discrimination, age discrimination, and retaliation with the Equal Employment Opportunity Commission ("EEOC") and cross-filed it with the Pennsylvania Human Relations Commission ("PHRC"). The EEOC issued a "Right to Sue Letter" to Meyers on June 7, 2012. This lawsuit followed.

Plaintiff commenced this action on August 30, 2012 by filing a six-count Complaint against Defendants, alleging that they violated the prohibitions on retaliation in Title VII and Title IX, the Age Discrimination in Employment Act ("ADEA"), the First Amendment protection against Free Speech, and the provisions of the PHRA that bar retaliation and age discrimination in the workplace. Defendants filed both an Answer and a Motion for Judgment on the Pleadings on November 16, 2012. Before that Motion was ruled upon, Plaintiff sought

---

10. In her declaration, DeFazio alleges that gender discrimination permeated the Department of Art and Design throughout the years. *See* Decl. of DeFazio, ECF No. 71-5; *see also* Pl.'s CSMF at 2, ECF No. 70 (detailing similar allegations). DeFazio also asserts that, since the events related to the cancelled graphic design search, CalU has implemented the "Robert's Rule" by which non-tenured faculty members are no longer permitted to chair faculty search committees. *See id* at 13.

and this Court granted him leave to file an Amended Complaint in which he dropped his ADEA claim against CalU and avers additional factual support for the remaining counts.

Defendants filed a Rule 12(b)(6) motion to dismiss on January 11, 2013, which was granted in part and denied in part. The Court dismissed the official capacity claims against the Employee Defendants at Count Three and the PHRA claims at Counts Four and Five; and permitted the remaining claims to proceed as pled.[11]

After the completion of discovery, the instant motion for summary judgment ultimately followed. *See* Mem. Op., ECF No. 51 (denying Plaintiff leave to file a second amended complaint in order to state an additional § 1983 claim against the Employee Defendants for their alleged violation of his right to free association).

## II.     Standard of Review

Summary judgment must be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant must identify those portions of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

To withstand a motion for summary judgment, the nonmoving party must show a genuine dispute of material fact for trial by citing to particular parts of material in the record. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). *See Celotex Corp.*, 477

---

11. Plaintiff's Second Amended Complaint does not reflect that the Court dismissed Count Four at the motion to dismiss stage. The Order of Court states as follows: "(1) Count One may proceed as pled; (2) Count Two may proceed as pled; (3) the personal capacity claims in Count Three may proceed as pled; the official capacity claims in Count Three are dismissed with prejudice; (4) *Count Four is dismissed with prejudice*; and (5) Count Five is dismissed with prejudice." ECF No. 30 at 23.

U.S. at 322 ("[T]he plain language of Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").  A dispute about a material fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* at 247–248.  *See Matsushita*, 475 U.S. at 586 ("When the moving party has carried its burden under Rule 56[ ], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."); *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) ("To survive summary judgment, a party must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue.").

The parties must support their position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," Fed. R. Civ. P. 56(c) (1)(A), or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact," Fed. R. Civ. P. 56(c)(1)(B).  In reviewing all of the record evidence submitted, the court must draw all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587.

The court is not permitted to weigh evidence or to make credibility determinations at this stage. *Anderson*, 477 U.S. at 255.  Those functions are for the jury, not the court. *Id.*  The court

is thus limited to deciding whether there are any disputed issues of fact and, if so, whether they are both genuine and material.  *Id.*

## III.    Discussion

There are two motions pending before the Court: the motion for summary judgment and the motion for judicial notice of *Lane v. Franks*, -- U.S. --, 134 S. Ct. 2369 (2014).  As an initial matter, the Court notes that the latter motion is little more than a notice of supplemental authority of a recent opinion of the United States Supreme Court.  The Court will undoubtedly consider binding precedent to the extent that it applies in this case and will deny the motion insofar as it seeks judicial notice of any adjudicative fact.[12]  The Court now turns to the substantive issues.

The three remaining counts of the Amended Complaint allege retaliation in violation of Title VII, 42 U.S.C. §§ 2000e, *et seq.*; Title IX, 20 U.S.C. §§ 1681, *et seq.*; and the First Amendment to the United States Constitution, *see* 42 U.S.C. § 1983.  For the reasons that follow, the Court will deny Defendants' motion for summary judgment as to Counts One and Two and grant their motion for summary judgment as to Count Three.

### A.  Counts One & Two: Title VII & Title IX Retaliation

The anti-retaliation provisions of Title VII "declares it to be an 'unlawful employment practice' for a covered employer 'to discriminate against' an employee 'because he has opposed any practice made an unlawful employment practice' by Title VII, or 'because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or

---

12.  As one district court has explained, "federal courts are bound to apply precedent without formally taking judicial notice of law, and the procedure for judicial notice under Fed. R. Evid. 201 applies only to adjudicative facts."  *Chapman v. Chast Manhattan Mortgage Corp.*, 04-CV-0859-CVEFHM, 2007 WL 4268774, at *2 n.7 (N.D. Okla. Nov. 30, 2007) (citing *Getty Petroleum Marketing, Inc. v. Capital Terminal Co.*, 391 F.3d 312 (10th Cir. 2004)).  *See also Lucero v. Wong*, C 10-1339 SI PR, 2011 WL 5834963, at *5 (N.D. Cal. Nov. 21, 2011) ("It is unnecessary to request that the Court judicially notice published cases from California and federal courts as legal precedent; the court routinely considers such legal authorities in doing its legal analysis without a party requesting that they be judicially noticed."; *Kruska v. Perverted Justice Found. Inc.*, CV 08-00054-PHX-SMM, 2010 WL 1875514, at *3 (D. Ariz. May 7, 2010) ("The recent decisions of the U.S. Supreme Court are not appropriate subjects for judicial notice as Rule 201 'governs only judicial notice of adjudicative facts.'").

hearing' thereunder." *Toth v. California Univ. of Pennsylvania*, 844 F. Supp. 2d 611, 642 (W.D. Pa. 2012) (quoting 42 U.S.C. § 2000e–3(a)) (alterations omitted). In order to establish a prima facie case of retaliation under Title VII, a plaintiff must tender evidence that: (i) he engaged in protected activity; (2) the employer took an adverse employment action against him; and (3) there was a causal connection between his participation in the protected activity and the adverse employment action. *Moore v. City of Philadelphia*, 461 F.3d 331, 340 (3d Cir. 2006). "If the employee establishes this prima facie case of retaliation, the familiar *McDonnell Douglas* approach [then] applies . . . ." *Id.* at 342.

A retaliation claim may also be brought under Title IX. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005). Moreover, Title IX does not include an express anti-retaliation provision, but the Supreme Court has recognized that the statute's "private right of action encompasses claims of retaliation against an individual because he or she has complained about sex discrimination." *Atkinson v. LaFayette Coll.*, 460 F.3d 447, 451-52 (3d Cir. 2006) (citing *Jackson,* 544 U.S. at 167). Simply put, "Title IX's cause of action is implied, while Title VII's is express." *Jackson*, 544 U.S. at 175.

Relevant here, Defendants assert that Plaintiff has not established the first and third prong of a retaliation claim. The Court will address each claim seriatim.

### 1. Protected Activity

Protected activity includes informal protests of discriminatory activities, such as making complaints to supervisors. *See Warfield v. SEPTA,* 460 F. App'x 127, 131 (3d Cir. 2012) (citing *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 702 (3d Cir. 1995)). "It [ ] does not include very generalized complaints about unfair treatment." *Id.* At the very least, "the conduct must convey a protest of discriminatory practices such that it will be understood that a complaint about an

unlawful employment practice has been advanced." *Id.* (citing *Curay–Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 135 (3d Cir. 2006)).

The Court finds that genuine disputes of material fact exist as to whether Plaintiff engaged in protected activity. For example, there is an obvious factual disagreement as to what occurred at the May 18, 2011 departmental meeting at which the alleged re-vote occurred: Meyers (along with Pinkham) recall that he raised concerns regarding the alleged gender discrimination in the hiring process; the Employee Defendants do not have such recall and assert that Meyers' is constructing a post hoc recreation of what took place.[13] To be sure, the record contains a tangle of allegations and attestations about what happened at the meeting.

The Court simply cannot resolve those disputes without first weighing the evidence—a function prohibited at this stage. *See generally Fuller v. Global Custom Decorating*, CIV.A. 3:2004-285, 2007 WL 44507, at *17 (W.D. Pa. Jan. 5, 2007) ("The declaration of Schoelkopf and the deposition testimony of the Plaintiff differ and this Court is not to make credibility determinations on summary judgment, but must leave this issue for the trier of fact.") Accordingly, the Court will deny the motion for summary judgment on this basis.

### 2. Causation

Courts generally analyze Title VII and Title IX retaliation claims under the same framework. *See Milligan v. Bd. of Trustees of S. Illinois Univ.*, 686 F.3d 378, 388 (7th Cir. 2012). The Supreme Court of the United States has, however, held that "Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened

---

13. Defendants argue that "there was nothing to oppose because none of the Defendants—or anyone else in the [D]epartment—favored the removal of the female candidate from the slate to be advanced for hiring." Defs.' Br. at 6, ECF No. 53. However, "in a Title VII retaliation case 'a plaintiff need not prove the merits of the underlying discrimination complaint, but only that he was acting under a good faith, reasonable belief that a violation existed.'" *Ellis v. Budget Maint., Inc.*, CIV.A. 13-2096, 2014 WL 2616829, at *3 (E.D. Pa. June 12, 2014) (quoting *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir. 1996)).

[motivating-factor] causation test stated in § 2000e–2(m)." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013). More recently, one district court has interpreted *Nassar* in the context of a Title IX claim as follows:

> While it is true that the legal analysis in Title VII and Title IX is often similar, the Court made clear in *Nassar* that its holding regarding but-for causation applied to Title VII, not Title IX. The Court distinguished its holding in *Jackson*, which specifically addressed retaliation under Title IX, from its analysis in *Nassar* because Title IX is a "broadly phrased antidiscrimination statute" while "Title VII is a detailed statutory scheme." *Nassar*, 133 S.Ct. at 2529-30.

*Miller v. Kutztown Univ.*, CIV.A. 13-3993, 2013 WL 6506321, at *3 (E.D. Pa. Dec. 11, 2013).[14]

Nevertheless, this but-for causation standard "does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013). As the United States Court of Appeals for the Second Circuit has explained "[a] plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action. From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Id. See also Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 284 (3d Cir. 2001) ("If a plaintiff demonstrates that the reasons given for her termination did not remain consistent, beginning at the time they were proffered and continuing throughout the proceedings, this may be viewed as evidence tending to show pretext, though of course it should be considered in light of the entire record.").

---

14. This Court need not weigh into the debate at this time or attempt to resolve how dual causation standards will play out at trial. *C.f. Nassar*, 133 S. Ct. at 2535 (Ginsburg, J., dissenting) (observing that "trial judges [ ] will be obliged to charge discrete causation standards" to jurors who "will puzzle over the rhyme or reason for the dual standards").

The evidence presented by Meyers suffices to create a genuine dispute of material fact as to whether Defendants' proffered reasons for his termination were merely a pretext for retaliation. These issues include questions of credibility (*e.g.*, whether Defendants were aware of Meyer's protected activity, assuming it occurred) which are for the factfinder to decide. Additionally, there are also inconsistencies and contradictions in the evaluations which led to the non-renewal of Meyer's contract and in the shifting explanations of that decision. In sum, Meyers has adduced sufficient evidence that could cause a reasonable jury to doubt the reason offered by CalU for his termination. Accordingly, the Court will deny the motion for summary judgment on this basis.

### B. Count Three: First Amendment Retaliation[15]

To state a First Amendment retaliation claim, "a plaintiff must allege two things: (1) that the activity in question is protected by the First Amendment, and (2) that the protected activity was a substantial factor in the alleged retaliatory action." *Hill v. Borough of Kutztown*, 455 F.3d 225, 241 (3d Cir. 2006) (citing *Phyllis Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005)). "The first factor is a question of law; the second factor is a question of fact." *Id.* (citing *Curinga v. City of Clairton*, 357 F.3d 305, 310 (3d Cir. 2004)). As our court of appeals has explained, "[a] public employee's statement is protected activity when (1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the

---

15. Meyers styles Count III as "Violations of Free Speech—Academic Freedom." However, as Defendants highlight, Meyers' claims do not arise from considerations of academic ideas or classroom instruction; rather, they relate to a faculty position search conducted by the Department. *See* Defs.' Br. at 15 n.7, ECF No. 53. Accordingly, the Court will analyze his claim under the more traditional approach. *See Gorum v. Sessoms*, 561 F.3d 179, 186 (3d Cir. 2009) ("But here we apply the official duty test because Gorum's actions so clearly were not 'speech related to scholarship or teaching,' *Garcetti*, 547 U.S. at 425, and because we believe that such a determination here does not 'imperil First Amendment protection of academic freedom in public colleges and universities.' *Id.* at 438 (Souter, J. dissenting)."); *see also Adams v. Trustees of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 563 (4th Cir. 2011) ("There may be instances in which a public university faculty member's assigned duties include a specific role in declaring or administering university policy, as opposed to scholarship or teaching. In that circumstance, *Garcetti* may apply to the specific instances of the faculty member's speech carrying out those duties.").

government employer did not have 'an adequate justification for treating the employee differently from any other member of the general public' as a result of the statement he made." *Id.* at 241-42 (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)).

In *Garcetti*, the Supreme Court held that a public employee does not speak "as a citizen" when he makes statements "pursuant to [his] official duties." 547 U.S. at 421. *See also Gorum v. Sessoms*, 561 F.3d 179, 185 (3d Cir. 2009) ("Put another way, the First Amendment does not shield the consequences of 'expressions employees make pursuant to their professional duties.'") (quoting *Garcetti*, 547 U.S. at 426). The proper inquiry at this step is "a practical one." *Garcetti*, 547 U.S. at 424. When making this practical inquiry, the Court is to examine, *inter alia*:

> (1) whether the employee's speech relates to "'special knowledge' or 'experience' acquired through his job," *Gorum,* 561 F.3d at 185 (citing *Foraker,* 501 F.3d at 240); (2) whether the employee raises complaints or concerns about issues relating to his job duties "up the chain of command" at his workplace, *Foraker,* 501 F.3d at 241; (3) whether the speech fell within the employee's designated responsibilities, *Gorum,* 561 F.3d at 186; and (4) whether the employee's speech is in furtherance of his designated duties, even if the speech at issue is not part of them. *See Foraker,* 501 F.3d at 243.

*Kimmett v. Corbett*, 554 F. App'x 106, 111 (3d Cir. 2014). Bearing these standards in mind, the Court cannot conclude that Meyers was speaking as a citizen when he apparently raised concerns with regard to gender discrimination in the hiring process at the departmental meeting and to members of the administration.[16]

Rather, the Court finds that Meyers made those alleged statements pursuant to his job duties as chair of the search committee and in furtherance of his duties in that position. The CalU Guide to Faculty Searches repeatedly stresses the need for faculty search committees to

---

16. The Court does not consider Meyers' grievances because he filed them after the departmental committee, the chair, and the dean all released their negative performance evaluations. The Court also notes that Meyers focuses almost all of his attention on whether his protected speech involved a matter of public concern; however, he does not address whether he made those statements pursuant to his official duties.

avoid any action that could result in accusations of discrimination.  *See, e.g.*, Defs.' Ex. D-3 at 11, ECF No. 55-2 ("During all phases of a search, everyone involved must be certain not to allow any bias or illegal discrimination to influence the evaluation of applicants or credentials."); *id.* at 37 ("[I]t is critical that the search and screen process for any prospective employee, especially within the interview portion of the experience, be devoid of any intentional or unintentional action that could result in accusations of discrimination.").  Meyers statements regarding gender bias in the hiring process would thus fall within these designated parameters. As Meyers acknowledges in his brief, "[he] advocated for a fair and nondiscriminatory progress of the Graphic Design search."  Pl.'s Br. at 23, ECF No. 69.  *See also id.* ("[Meyers] took pains to ensure that the Graphic Design search proceeded in accordance with this public contract, going so far as to contact then associate CalU provost Stanley Komacek for guidance on how to proceed."); *id.* at 24 ("At the heart of Prof. Meyers's concerns were concerns about institutional sexism and concerns regarding the integrity and maintenance of a public contract, the CBA."). Meyers similarly conveyed these concerns to members of the administration (*i.e.*, up the chain of command) such as McBride, Komacek, Sproul, and Armenti.  Accordingly, the Court concludes that Meyers did not engage in protected speech for the purpose of his First Amendment retaliation claim, and therefore, it will grant summary judgment as to the Count Three and dismiss the Employee Defendants from this action.

## IV.    Conclusion

For the reasons hereinabove stated, the Court will deny the motion for summary judgment as to Counts One and Two, grant the motion for summary judgment as to Count Three, and dismiss the Employee Defendants from this action.  An appropriate Order follows.

McVerry, J.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBERT MEYERS, | ) |
| | ) |
| Plaintiff, | )    2:12-cv-1258 |
| | ) |
| v. | ) |
| | ) |
| THE CALIFORNIA UNIVERSITY OF | ) |
| PENNSYLVANIA, GREG HARRISON, | ) |
| RICHARD MIECZNIKOWSKI, JIM BOVÉ and | ) |
| SCOTT LLOYD, | ) |
| | ) |
| Defendants. | ) |

## ORDER OF COURT

AND NOW, this 31st day of July, 2014, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED and DECREED** that the MOTION FOR SUMMARY JUDGMENT (ECF No. 52) filed by Defendants The California University of Pennsylvania, Greg Harrison, Richard Miecznikowski, Jim Bové, and Scott Lloyd is **GRANTED IN PART AND DENIED IN PART** as follows:

(1) the motion for summary judgment as to Count One and Two is **DENIED**; and

(2) the motion for summary judgment as to Count Three is **GRANTED**, and the Employee Defendants Greg Harrison, Richard Miecznikowski, Jim Bové, and Scott Lloyd are **DISMISSED** from this action.

**IT IS FURTHER ORDERED** that the caption in this matter is hereby **AMENDED** as follows:

| ROBERT MEYERS, | ) |
| | ) |
| Plaintiff, | )  **2:12-cv-1258** |
| | ) |
| v. | ) |
| | ) |
| THE CALIFORNIA UNIVERSITY OF | ) |
| PENNSYLVANIA, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**IT IS FURTHER ORDERED** that the MOTION FOR JUDICIAL NOTICE (ECF No. 72) filed by Plaintiff Robert Meyers is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that Plaintiff shall file a pre-trail narrative statement on or before August 14, 2014 and Defendant CalU shall file a pre-trial narrative statement on or before August 21, 2014.  A pre-trial conference is scheduled before the undersigned on Friday, August 22, 2014 at 1:45 p.m. in Courtroom 6C, United States Courthouse, 700 Grant Street, Pittsburgh, PA 15219.

BY THE COURT:

s/Terrence F. McVerry
United States District Judge

cc:     James B. Lieber
Email: jlieber@lhhb-law.com
Jacob M. Simon
Email: jsimon@lhhb-law.com
Thomas M. Huber
Email: thuber@lhhb-law.com

Scott A. Bradley
Email: sbradley@attorneygeneral.gov

2